02-11-029-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00029-CV

 

 


 
 
 Wesley Henson
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 Allen Reddin
 
 
  
 
 
 APPELLEE
 
 


 

 

----------

 

FROM THE County
Court at Law OF Wise COUNTY

----------

 

OPINION

----------

 

I. 
Introduction

 

          We
address two issues in this appeal:  whether the evidence is legally and
factually sufficient to establish that Appellant Wesley Henson converted parts
belonging to Appellee Allen Reddin and whether Reddin’s evidence of conversion
damages is legally and factually sufficient to support the trial court’s
judgment awarding Reddin $4,561.52 in damages.  Because the evidence is legally
and factually sufficient to establish a conversion and because the evidence of
damages is legally and factually sufficient to support the trial court’s
judgment, we will affirm.

II.  Factual
and Procedural Background

A. 
Overview

          The
dispute between Henson and Reddin centered on a polyurethane machine used to
spray truck bed liners, insulation, “or whatever you want to spray with it.”[1]
 The polyurethane machine was permanently mounted inside an enclosed gooseneck
trailer that had “Discount Industrial Coating, Incorporated”[2]
emblazoned on it.[3]  The polyurethane machine
had not been used for a while, so it had become clogged and was not in working
order.  Henson owned a one-half interest in Discount Industrial Coating, Inc.; Joseph
Brophy owned the other one-half interest.

Henson
decided that he wanted to sell his one-half interest in the company, and Reddin
let Henson know that he was interested in purchasing the polyurethane machine
if he could get it in working order.  Reddin purchased parts and began working
on the polyurethane machine in an attempt to get it in working order.  After
Reddin had purchased parts and had added them to the polyurethane machine,
Henson moved the trailer in which the polyurethane machine was located.  Henson
did not return any parts to Reddin and did not disclose the location of the
polyurethane machine.

B. 
Reddin’s Testimony

          Regarding
the parts that were added to the polyurethane machine, Reddin testified that he
had paid $2,690.28 for a fusion gun and a transfer pump; $1,800 for one kit of
foam;[4]
$57.66 for a set of hoses; and $13.68 for a “Y strainer iron body 20 mesh.”  Reddin
provided receipts for the amounts that he had spent on the parts, and the
receipts were admitted into evidence without objection.  Reddin and Brophy
attached the parts to the polyurethane machine on a Friday, but they were not
able to get the polyurethane machine in working order that day.

According
to Reddin, on the same day that he added the parts to the polyurethane machine,
he talked to Henson about the price of the polyurethane machine.  Henson asked
$10,000 for the polyurethane machine, and Reddin offered $5,000.  Reddin said
that Henson indicated he “was going to think about it.”  During this conversation,
Reddin told Henson that the parts were on the trailer.  By Monday, the trailer
was gone.

Reddin
testified that he called Henson several times indicating that he needed to get
the parts back from the trailer, but Henson did not return his calls. Reddin
was able to talk to Henson one time about getting the parts back, but Henson
told him that “he wasn’t bringing nothing back.”

After
four to six weeks had passed, Reddin saw the trailer in Newark and called
Brophy.  They went and retrieved the trailer, but police stopped them and told
them to take it back.  They returned the trailer to the place where they had
found it.  Reddin testified that the plan in retrieving
the trailer was for him to remove parts and for Brophy to keep the trailer and
work out the issue with Henson.

Reddin
thereafter sued Henson for conversion and sought to recoup the damages that he
had sustained when the parts that he had installed on the polyurethane machine
were ruined.[5]

C. 
Brophy’s Testimony

Brophy
was familiar with the polyurethane machine that Reddin was interested in
acquiring, and Brophy knew that the machine was not working because a substance
had crystallized in the machine.  Brophy told Reddin that he would need to
bring parts to test the machine and to see if it could be restored to working
order.  Reddin purchased the parts, and they were installed on the machine, but
Brophy testified that he and Reddin were not able to get the machine to work.  Brophy
and Reddin finished working on the machine one Friday evening, and when they
came back on the following Monday, the trailer was gone. 

Brophy
said that the trailer was later discovered at Henson’s in-laws’ house in Newark,
that he did not know how the trailer got there, and that he did not contact
Henson about it.  Brophy hooked up the trailer and attempted to bring it back
to where it had previously been located because he owned a one-half interest in
the trailer and equipment.

When
Brophy was about a half a mile down the road with the trailer, he was pulled
over by a Rhome Police Officer, who told him to take the trailer back and to
settle the issue in court.  Brophy asked Henson why 

he was trying to have
me thrown in jail for stealing something that I owned half of.  And what he was
doing.  And why he was doing it.  And he said this is a matter that has to be
solved in Court, and I’ll see you in Court.  And you won’t get anything until
we go to Court.

Brophy
also told Henson during the above conversation that Reddin’s parts were on the rig.


D.  Henson’s
Testimony

Henson
testified that he knew that Reddin was working on the machine to see if he
could get it in working order to purchase it.  Reddin had to bring his own parts
in order to make repairs on the machine.  Henson, however, testified that he
did not authorize Reddin to make any repairs.

Henson
testified that he and Reddin never reached a deal for the sale of the machine
or for Henson’s interest in Discount Industrial Coating.  Henson testified that
he never told Reddin that he would “think about his offer.”  Instead, he told
Reddin that he should buy a polyurethane machine that Henson had seen online
for $4,500.  From Henson’s standpoint, he had already declined Reddin’s offer,
so Reddin was no longer purchasing the machine. 

Henson
testified that the trailer in which the machine was mounted was his property,
not the property of Discount Industrial Coating.  Henson said he got the
trailer on January 13, 2007, and took it to his father-in-law’s home because he
was trying to sell the machine to a business owned by his father-in-law.

Henson
received a call from Brophy on January 15, 2007, telling him that Reddin had
some property in the trailer; Henson testified that Brophy’s call was the first
time that Henson was informed that Reddin had property on the trailer.  Henson
told Brophy, “Just tell Allen to call me, and he can get his stuff off.”  Henson
said Reddin never contacted him and did not return his phone calls.  Henson
later clarified that he had in fact received a phone call from Reddin while he
was on the phone with Brophy.  Henson said he returned Reddin’s call and left a
message that Reddin could call and come get the parts, but Reddin never called
him. 

The
next day, on January 16, 2007, Henson received a call that the trailer was
being stolen, and the police were called.  The
trailer was returned to Henson’s in-laws’ property.  After Brophy returned the
trailer, Henson moved the trailer to a new location. 

Upon
cross-examination, Henson testified that he was aware as of January 15, 2007, that
Reddin’s property was on the rig.  Henson was also aware that Reddin was
running resin and polycarbonate through the hoses to get the machine to work.  Henson
initially testified that he was not aware that if Reddin did not get his parts off
the rig that the resin would eventually set up, crystallize, and cause the
parts to become useless.  Henson later testified that he knew that if Reddin
was not able to recover the parts that he had added to the machine, they would
become worthless; that was why Henson told Reddin to come and get his “stuff.” 

E.  The
Lawsuit

Reddin
sued Henson in the justice court asserting a conversion claim and a money had
and received claim.  Henson failed to appear, and Reddin obtained a default
judgment for $4,457—the amount he paid for the parts, plus court costs—against
Henson.  Henson appealed the judgment to the county court at law, arguing that
Discount Industrial Coating, Inc. should be added to the suit.  Reddin added Discount
Industrial Coating as a defendant, and Henson and Discount Industrial Coating
moved for summary judgment on Reddin’s conversion claim and on his money had
and received claim.  The county court at law denied summary judgment on the
conversion claim but granted summary judgment on the money had and received
claim.  The conversion claim was tried to the court. 

          After
hearing the testimony from Reddin, Henson, and Brophy, the county court at law signed
a judgment for Reddin in the amount of $5,419.46––$4,561.52 in damages plus $857.94
in prejudgment interest.  The trial court made the following findings of fact:

1.  On or about
December 2006, Defendant Wesley Henson became interested in selling either his
share of Defendant Discount Industrial Coating, Inc., or a machine that was an
asset of that corporation.

 

2.  On or about
December 2006, Plaintiff became interested in purchasing either the business
interest or the machine.

 

3.  The machine was
not in working order.

 

4.  On or about
December 2006 and January 2007, Plaintiff purchased certain items of equipment
and tools for the purpose of repairing the machine and estimating its value.

 

5.  The items and
tools included a kit of foam, a transfer pump, a fusion gun, and assorted
hoses, hereinafter called the “property.”

 

6.  Plaintiff
purchased the property on the open market from retailers for the amount of
$4,561.52.

 

7.  The value of such
items in Wise County, Texas, at that time was $4,561.52. 

 

8.  At the time of
the events described below, Plaintiff Allen Reddin was the owner of the
property.

 

9.  In early January,
2007, Defendant Henson took a trailer containing the property and held it away
from Plaintiff, which had the effect of destroying the property for its
intended use.

 

10.  By January 15,
2007, Defendant Henson unlawfully assumed and exercised control over the
property to the exclusion of Plaintiff Reddin’s rights as an owner.

 

11.  Defendant Henson
refused to return the property to Plaintiff Reddin after Plaintiff Reddin
demanded the return of the property from Defendant Henson personally and
through Defendant Henson’s business associate.

 

12.  Plaintiff Reddin
originally filed suit in this cause on March 13, 2007. 

 

          The
trial court also made the following conclusions of law:

1.  Defendant Wesley
Henson individually converted the property belonging to Plaintiff Allen Reddin.

 

2.  Defendant Henson
is individually liable to Plaintiff Reddin for actual damages in the amount of
$4,561.52, and for prejudgment interest in the amount of $857.94.

 

3.  The indebtedness
of Defendant Henson to Plaintiff Reddin bears interest at the rate of 5.00%
from December 16, 2010 until paid. 

 

Henson
perfected this appeal. 

III.  Standards
of Review

Findings
of fact entered in a case tried to the court have the same force and dignity as
a jury=s
answers to jury questions.  Anderson v. City of Seven Points, 806 S.W.2d
791, 794 (Tex. 1991).  The trial court=s
findings of fact are reviewable for legal and factual sufficiency of the
evidence to support them by the same standards that are applied in reviewing
evidence supporting a jury=s answer.  Ortiz v. Jones,
917 S.W.2d 770, 772 (Tex. 1996); Catalina v. Blasdel, 881 S.W.2d 295,
297 (Tex. 1994).

 

A.  Legal
Sufficiency Standard

We
may sustain a legal sufficiency challenge only when (1) the record discloses a
complete absence of evidence of a vital fact, (2) the court is barred by rules
of law or of evidence from giving weight to the only evidence offered to prove
a vital fact, (3) the evidence offered to prove a vital fact is no more than a
mere scintilla, or (4) the evidence establishes conclusively the opposite of a
vital fact.  Uniroyal Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 334
(Tex. 1998), cert. denied, 526 U.S. 1040 (1999); Robert W. Calvert, "No
Evidence" and "Insufficient Evidence" Points of Error, 38
Tex. L. Rev. 361, 362–63 (1960).  In determining whether there is legally
sufficient evidence to support the finding under review, we must consider
evidence favorable to the finding if a reasonable factfinder could and
disregard evidence contrary to the finding unless a reasonable factfinder could
not.  Cent. Ready Mix Concrete Co. v. Islas, 228 S.W.3d 649, 651 (Tex.
2007); City of Keller v. Wilson, 168 S.W.3d 802, 807, 827 (Tex. 2005).

B.  Factual
Sufficiency Standard

When
reviewing an assertion that the evidence is factually insufficient to support a
finding, we set aside the finding only if, after considering and weighing all
of the evidence in the record pertinent to that finding, we determine that the
credible evidence supporting the finding is so weak, or so contrary to the
overwhelming weight of all the evidence, that the answer should be set aside
and a new trial ordered.  Pool v. Ford Motor Co., 715 S.W.2d 629, 635
(Tex. 1986) (op. on reh’g); Garza v. Alviar, 395 S.W.2d 821, 823 (Tex.
1965).

IV.  Sufficiency Analyses

A.  
Claim for Conversion

          In
his first issue, Henson argues that the evidence is legally and factually
insufficient to establish that he converted any property belonging to Reddin; Henson
argues that the evidence is legally and factually insufficient to establish
that he knew at the time he removed the trailer that he was taking Reddin’s
property. 

          Conversion
is the unauthorized and wrongful assumption and exercise of dominion and
control over the personal property of another to the exclusion of, or
inconsistent with, the owner’s rights.  Khorshid, Inc. v. Christian, 257
S.W.3d 748, 758–59 (Tex. App.—Dallas 2008, no pet.) (citing Waisath v.
Lack’s Stores, Inc., 474 S.W.2d 444, 447 (Tex. 1971)).  To establish a
claim for conversion of personal property, a plaintiff must prove that (1) he
owned or had legal possession of the property or entitlement to possession; (2)
the defendant unlawfully and without authorization assumed and exercised
dominion and control over the property to the exclusion of, or inconsistent
with, the plaintiff’s rights as an owner; (3) the plaintiff demanded return of
the property; and (4) the defendant refused to return the property.  Id.
at 759 (citing Smith v. Maximum Racing, Inc., 136 S.W.3d 337, 341 (Tex.
App.—Austin 2004, no pet.)).  Acting with good faith or innocence is not a
defense to conversion.  Id. (citing Maximum Racing, Inc., 136
S.W.3d at 343).

Here,
as set forth above, the trial court found that Reddin had “purchased certain
items of equipment and tools for the purpose of repairing the machine and
estimating its value”; that Henson had taken “a  trailer containing the
property and [had] held it away from [Reddin], which had the effect of
destroying the property for its intended use”; that “Henson unlawfully [had] assumed
and [had] exercised control over the property to the exclusion of Plaintiff
Reddin’s rights as an owner”; and that “Defendant Henson [had] refused to
return the property to Plaintiff Reddin after Plaintiff Reddin [had] demanded
the return of the property from Defendant Henson personally and through
Defendant Henson’s business associate.”  The record supports these findings.[6] 


The testimony
at trial established that Reddin was attempting to get the polyurethane machine
in working order, that Reddin had purchased parts for the machine, that Reddin had
installed the parts on the machine, and that Henson thereafter moved the
trailer in which the machine was mounted.  Reddin testified that he had called
Henson numerous times, attempting to retrieve the parts, but Henson did not
answer; the one time that Henson answered, he refused Reddin’s request.  Viewing
the evidence favorable to the trial court’s findings, as we must, and
disregarding the evidence to the contrary because a reasonable factfinder could
do so based on a credibility determination, the evidence is legally sufficient to
support the trial court’s findings supporting each element of conversion of
Reddin’s property by Henson.  See Burns, 190 S.W.3d at 270 (holding
evidence legally sufficient to support conversion judgment); Automek, Inc.
v. Orandy, 105 S.W.3d 60, 63 (Tex. App.—Houston [1st Dist.] 2003, no pet.)
(holding evidence legally and factually sufficient to support conversion judgment
against one defendant); see also Cargal v. Cargal, 750 S.W.2d
382, 384 (Tex. App.—Fort Worth 1988, no writ) (holding evidence legally
sufficient to support conversion judgment).

          In
considering the factual sufficiency of the evidence to support the trial
court’s findings, we consider Henson’s testimony that is contrary to the
findings.  Henson testified that he did not know until after he moved the
trailer that Reddin had parts on it.  But even if Henson did not know about Reddin’s
parts until after the trailer was moved, his innocence is no defense to
conversion.  See Khorshid, Inc., 257 S.W.3d at 759; Am.
Petrofina, Inc. v. PPG Indus., Inc., 679 S.W.2d 740, 759 (Tex. App.––Fort
Worth 1984, writ dism’d) (holding that neither complete innocence nor perfect
good faith are defenses to an action for conversion); Chrysler Credit Corp.
v. Malone, 502 S.W.2d 910, 914–15 (Tex. Civ. App.—Fort Worth 1973, no writ);
White-Sellie's Jewelry Co. v. Goodyear Tire & Rubber Co., 477 S.W.2d
658, 662 (Tex. Civ. App.—Houston [14th Dist.] 1972, no writ) (same).  Additionally,
although the record contains conflicting testimony regarding Henson’s refusal
to return Reddin’s parts to him––Henson claimed he offered to let Reddin call
and come get the parts, while Reddin testified that Henson would not return his
calls and refused to permit him to come get the parts––the trial court is the
sole judge of the credibility of the witnesses and is to resolve any
inconsistencies in their testimony.  See Burns, 190 S.W.3d at 269–70
(recognizing trial court could reject conversion-judgment defendant’s version
of events, including that he had offered to return property).  Considering and
weighing all of the evidence in the record pertinent to that finding, including
that Henson’s delay in authorizing the retrieval of the property that had the
effect of destroying the parts, the credible evidence supporting the finding is
not so weak, or so contrary to the overwhelming weight of all the evidence,
that the finding should be set aside and a new trial ordered.  See id. at
270 (holding evidence factually sufficient to prove that defendant refused
plaintiff’s request for return of the equipment); Automek, Inc., 105
S.W.3d at 63 (holding evidence factually sufficient to support conversion
because plaintiff made demand and defendant refused).  We overrule
Henson’s first issue challenging the legal and factual sufficiency of the
evidence to show that a conversion took place.

B.  Damages

          In
his second issue, Henson argues that the evidence is legally and factually
insufficient to support the judgment’s damage award.  Henson contends that the
only evidence in the record concerning damages consisted of Reddin’s receipts
for the property.  Henson argues that while this evidence establishes the purchase
price of the property, it wholly fails to establish the fair market value of
the property, which Henson contends is the sole measure of damages for
conversion.  

          Generally,
the measure of damages in a conversion case is the fair market value of the
property converted at the time of the conversion, with legal interest.  United
Mobile Networks, L.P. v. Deaton, 939 S.W.2d 146, 147–48 (Tex. 1997).  Fair
market value has been defined as the price that the property would bring when
it is offered for sale by one who desires, but is not obliged to sell, and is
bought by one who is under no necessity of buying it.  Burns, 190 S.W.3d
at 270.  A property owner may testify about the market value of his property if
his testimony shows that he is familiar with the market value and his opinion
is based on that market value.  Khorshid, 257 S.W.3d at 760.

          However,
when converted property has no readily ascertainable fair market value, the
measure of damages is the actual value of the property to the owner at the time
of its loss.  Burns, 190 S.W.3d at 270 (citing Crisp v. Sec. Nat’l
Ins. Co., 369 S.W.2d 326, 328–29 (Tex. 1963)).  In such circumstances, the
purchase price is probative of actual value.  See id.  The original cost
in the market and the manner and time and place of its use, the appearance
before and after the alleged injury, and the relative usefulness and physical
condition may be  offered into evidence to establish conversion damages.  Wutke
v. Yolton, 71 S.W.2d 549, 552 (Tex. Civ. App.—Beaumont 1934, writ ref’d).

          For
example, the Beaumont court in Wutke examined what type of evidence was
admissible to determine actual value for secondhand furniture because no
standard of market value existed.  Id.  The appellate court explained
that the trial court

did not err in
receiving evidence as to what appellees paid for the furniture “several years
before the date of the conversion.”  This testimony was admissible on the issue
of actual value.  . . . “When goods of this character are destroyed, a proper
method of arriving at their value at the time of loss is to take into
consideration the cost of the articles, the extent of their use, whether worn
or out of date, their condition at the time, etc., and for them to determine
what they were fairly worth.  The cost alone would not be the correct criterion
for the present value, but it would be difficult to estimate the value of such
goods, except by reference to the former price in connection with wear,
depreciation, change of style, and present condition.

Id.

Testimony
and evidence regarding purchase price, however, standing alone, is not
factually sufficient to support a fair-market-value damages award or an
actual-value damages award.  See Lee v. Dykes, 312 S.W.3d 191,
199 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (stating that “it is not
axiomatic that a plaintiff can sell property for the same amount at which he
purchased it”).  When converted property has no readily ascertainable fair
market value, the measure of damages is the actual value of the property to the
owner at the time of its loss and evidence of purchase price constitutes a
starting point for determining actual damages.  See Wutke, 71
S.W.2d at 552.  From that starting point, amounts are subtracted for wear and
tear, depreciation, etc.  See id.  

Here,
Reddin offered receipts for the parts into evidence and testified as to the
purchase price of the parts that he had installed on the polyurethane machine. 
The receipts document that all of the parts were purchased within two to three
weeks of the date they were installed on the polyurethane machine.  The
receipts indicate that M&M Insulation purchased the parts; Reddin testified
that M&M Insulation was Brophy’s company and that he, Reddin, had actually
paid for the parts.  Reddin said that he purchased them through Brophy’s
company because “I get my stuff cheaper through his account.  I didn’t have an
account with companies that he’s got.”  Reddin also testified that the parts
were worthless after the conversion because they had been ruined by the resin
crystallizing in the polyurethane machine.  The evidence conclusively
establishes that the new parts were installed on the polyurethane machine on a
Friday and that Henson moved the trailer with the machine mounted in it either
one or two days after the new parts were installed; when Reddin and Brophy
returned to work on the machine on Monday, it was gone.

Considering
the evidence favorable to the trial court’s finding that Reddin purchased the
parts for $4,561.52 and its finding that the value of the parts in Wise County,
Texas, at the time was $4,561.52, legally sufficient evidence exists to support
these findings.  Reddin testified to the purchase price of the parts and provided
receipts documenting the prices; the parts were purchased within a few weeks of
the date they were installed on the polyurethane machine and were on the
machine only one or two days before they were converted.  This evidence is
legally sufficient to support the trial court’s award of $4,561.52 in damages
to Reddin under either an actual value or a fair market value measure of
damages.  See Redman Homes, Inc. v. Ivy, 920 S.W.2d 664, 669 (Tex. 1996)
(holding evidence legally sufficient to allow jury to assess damages when
property owner gave dollar figures regarding price he would place on personal
items lost in mobile home fire); Burns, 190 S.W.3d at 271 (holding
evidence legally sufficient to sustain assessment of damages based on testimony
of purchase price paid for bar equipment).  We therefore overrule the
portion of Henson’s second issue challenging the legal sufficiency of the
evidence to support the damages award.

This
evidence is likewise factually sufficient to support the trial court’s award of
$4,561.52 in damages to Reddin under either an actual value or fair market
value measure of damages.  As mentioned above, the evidence established the
price Reddin paid for the parts just a few weeks before he installed them on
the machine, meaning there was little time for depreciation of the parts.  Compare
Lee, 312 S.W.3d at 199 (holding plaintiff’s testimony of purchase price
of diamond ring one and one-half years before conversion did not establish fair
market value of ring in absence of evidence of appreciation or depreciation
since purchase), with Wutke, 71 S.W.2d at 552 (recognizing depreciation
is one factor in establishing actual value).  The evidence established that
Reddin was able to purchase the parts at a lower price by purchasing them
through Brophy’s company’s account, meaning there was little risk that Reddin
had overpaid for the parts and was seeking recovery of more than what the parts
were actually worth.  Compare Lee, 312 S.W.3d at 199.  The evidence
established that the machine was converted one or two days after the
installation of the new parts, meaning that the parts had experienced little
wear and tear prior to their conversion.  See Wutke, 71 S.W.2d at
552 (recognizing purchase price minus wear, depreciation, change of style, and
present condition can establish actual value).  Thus, here, evidence of
purchase price existed, evidence of no or only a few weeks’ of depreciation
existed, evidence of the fairness or lowness of the purchase price existed, and
evidence of no or very little wear and tear on the parts existed.  No
controverting evidence probative of fair market value or of actual value was
introduced into evidence.  After considering and weighing all of the evidence
in the record pertinent to the trial court’s $4,561.52 damages finding, the
credible evidence supporting the finding is not so weak that the answer should
be set aside and a new trial ordered, and the finding is not contrary to the
overwhelming weight of all the evidence because no controverting evidence
probative of actual value or of fair market value was introduced into
evidence.  We overrule the portion of Henson’s second issue challenging the
factual sufficiency of the evidence to support the damages award.

V.  Conclusion

          Having
overruled both of Henson’s issues, we affirm the trial court’s judgment.

 

 

SUE WALKER
JUSTICE

 

PANEL: 
LIVINGSTON,
C.J.; DAUPHINOT and WALKER, JJ.

 

DELIVERED:  January 5, 2012









[1]The polyurethane machine
had heat pumps to make the liquid come through the hoses and spray onto barns
or bed liners.  Reddin said that there were two sides with a mix at the end of
the “gun.”





[2]We note that the reporter’s
record refers to the company as “Discount Industrial Coatings,
Incorporated” while the pleadings refer to “Discount Industrial Coating,
Incorporated.”  For consistency, we use the party name shown in the pleadings.





[3]We note that the record
contains references to a trailer and a rig, as well as to a machine, a gun, and
a compressor.  Because some of these terms appear to be used interchangeably,
it is not always clear from the testimony what the parties are referring to.





[4]The receipt shows $18,000
for ten kits of foam, but Reddin testified that only one was added to the
polyurethane machine.





[5]Reddin explained that the
parts that he had added to the polyurethane machine were ruined because the
resin he had attempted to run through the lines in the polyurethane machine had
sat in the pump and had crystallized when he was denied access to the machine. 
Reddin testified that it is not normal practice to clean the lines on the
polyurethane machine every day and that the machine could have been cleaned out
up to a week later without any harm to the parts that he had installed.





[6]We note at the outset that
Henson’s ownership of the trailer and one-half interest in the machine fails to
authorize Henson’s conversion of the parts Reddin added to the machine.  See
Burns v. Rochon, 190 S.W.3d 263, 266–70 (Tex. App.—Houston [1st
Dist.] 2006, no pet.) (lessor’s right to lockout holdover tenant failed to
authorize conversion of lessee’s leased equipment).